COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judge Clements and Senior Judge Coleman
Argued at Alexandria, Virginia


JAMES EDWARD GAFFNEY
                                                        OPINION BY
v.        Record No. 1286-04-4          JUDGE JEAN HARRISON CLEMENTS
                                                        MAY 24, 2005
ROSEANNE GAFFNEY


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Gaylord L. Finch, Jr., Judge

Stacy M. Davis (Daniel G. Dannenbaum; The Lewis Law Firm, on
briefs), for appellant.

Marcia M. Maddox (Katharine W. McGregor; Melannie J.
Hutzelman; Maddox Cole & Miller, P.C., on brief), for appellee.


James Edward Gaffney (husband) appeals from the trial court's equitable distribution

award. On appeal, husband contends the trial court erred in (1) deciding he and Roseanne

Gaffney (wife) had entered into a valid and binding property settlement agreement and

incorporating the terms of that purported agreement into the final decree of divorce, (2) granting

wife attorney's fees of $15,000, and (3) ordering him, in conjunction with its award to wife of

fifty percent of the marital share of his United States Public Health Service pension, to indemnify

wife for any future diminution of that award resulting from his waiver of retirement pay in order

to receive additional disability pay. For the reasons that follow, we hold the trial court erred in

deciding the parties had entered into a valid and binding property settlement. Accordingly, we

reverse and remand the issues of equitable distribution and attorney's fees.

## I. BACKGROUND

"On appeal, we construe the evidence in the light most favorable to wife, the prevailing party below, granting to that evidence all reasonable inferences fairly deducible therefrom." Wright v. Wright, 38 Va. App. 394, 398, 564 S.E.2d 702, 704 (2002).

So viewed, the evidence established that husband and wife married in 1977 and separated in December 2000. No children were born of the marriage. In July 2002, wife filed for divorce requesting, *inter alia*, spousal support, attorney's fees, and equitable distribution of the parties' marital assets. In November 2002, husband filed an answer and cross-bill for divorce also seeking spousal support, attorney's fees, and equitable distribution. An *ore tenus* hearing was scheduled for October 21, 2003.

On October 16, 2003, wife's counsel sent husband's counsel a letter via e-mail setting forth the terms of a proposed property settlement agreement. The first sentence of the letter read, "Pending [husband's] response to our latest proposal as to the pension issue, the following is the agreed settlement of property, which will be bifurcated from the issues of pension and spousal support at court." The first fourteen paragraphs of the proposed agreement described how the parties' real property, personal property, debts, and obligations were to be distributed. The last three paragraphs set forth proposals for settling the outstanding issues of husband's pension, spousal support, and the further incurrence of attorney's fees. The same day, husband's counsel responded via e-mail, "I can't sign the letter, *per se*, but I confirm by this e-mail that the portion of the letter describing the settled terms [set forth in paragraphs one through fourteen] accurately reflects our agreement."

Prior to the October 21, 2003 hearing, wife's counsel presented husband's counsel with a formal "Separation and Property Settlement Agreement" signed by wife. The proposed agreement encompassed all of the terms set forth in wife's counsel's October 16, 2003 e-mail,

contained additional boilerplate language and details regarding the implementation of those terms, and noted that the issues of spousal support, husband's pension, and further incurred attorney's fees were to be submitted to the trial court for resolution at the October 21, 2003 hearing.

On the morning of the October 21, 2003 hearing, husband's counsel informed wife's counsel that husband had not yet signed the proposed agreement but he "intended to obtain his signature following the proceedings." Although he believed the "agreement set forth a settlement between the parties" and that he "had authority from [husband] to enter into the agreement" on husband's behalf, husband's counsel was not sure at the time that husband would actually sign the proposed agreement.

At the commencement of the October 21, 2003 hearing, the trial court noted that both parties were represented by counsel and that the case was before the court for equitable distribution. In her opening statement, wife's counsel asserted that the parties had "accumulated nearly $920,000 . . . in non-retirement assets" and "$44,000 in retirement savings." She then stated:

> Those assets have been divided by agreement fifty/fifty and each side has prepared a chart of the agreed assets each will receive. The only difference in the charts is that we differ in the value of the condo that [wife] will receive.

> And [husband] places a $25,000 figure on twenty-six year old furniture that [wife] has in her possession. Other than that, I don't believe there's any dispute.

Wife's counsel then asserted that the only outstanding issues needing determination by the court were the division of husband's United States Public Health Service pension, spousal support, and attorney's fees related to the October 21, 2003 hearing.

In his opening statement, husband's counsel confirmed wife's counsel's remarks regarding the parties' purported settlement: "The parties have—as [wife's counsel] has

indicated—resolved the issue of property division, with the exception of the pension. And we're going to each submit exhibits to Your Honor showing what we believe the parties['] property settlement to be worth. And there's clear differences in the values."

Both parties then testified and presented exhibits with respect to the outstanding issues of husband's pension, spousal support, and attorney's fees. Much of that evidence regarded the parties' projected incomes and expenses and the value of the assets divided under the terms of the parties' purported settlement. To the extent it showed the division of the parties' property, such evidence was not inconsistent with the basic terms of the proposed agreement signed by wife and presented to husband's counsel, although not all the terms of that agreement were reflected in the evidence.

On direct examination, wife testified that her Exhibit 1 was a chart "of the division of property for the settled part of this case." Wife's Exhibit 1 listed the value and allotment of certain of the parties' assets and liabilities and showed a lump-sum payment to wife of $15,000. Later in the hearing, wife testified that the value of the parties' furniture, which was allotted to her under "the terms of the settlement," was worthless and that she "was required to pay in terms of the settlement" the debt incurred during the marriage on five credit cards, which totaled $43,417. She also testified that, "[a]s part of the settlement," she had agreed to cooperate if husband wished a continuation of health insurance. On cross-examination, wife testified that, under the terms of the settlement, she was to receive title to the marital home and would assume responsibility for the $47,000 in back taxes she owed.

On direct examination, when shown his Exhibit 1 and asked, "Is that your evaluation of the value of the settlement," husband responded, "Basically, yes, it is." Like wife's Exhibit 1, husband's Exhibit 1 listed the value and allotment of certain of the parties' assets and liabilities and showed a lump-sum payment to wife of $15,000. Husband further testified that, "as part of

- 4 -

the settlement," he relinquished a credit of $53,000 he was originally to have received. Husband also testified that his Exhibit 2 represented "a description of the income producing portion of the asset settlement that he and [wife] reached" and that, "as part of the settlement," he agreed to pay $10,000 of wife's attorney's fees and a lump sum of $15,000. At no point during the hearing did husband object to any of the numerous references to the settlement.

The parties presented additional evidence during the hearing regarding wife's request for half of the marital portion of husband's pension and their requests for an award of attorney's fees and spousal support. At the conclusion of the evidence and argument by counsel, the trial court awarded wife half of the marital share of husband's pension, granted both parties a reservation of the right to seek spousal support in the future, and denied the parties' requests for attorney's fees.

On November 19, 2003, wife filed a motion requesting that the terms of the "settlement of property issues reached and affirmed by the parties" at the October 21, 2003 hearing be incorporated into a final decree of divorce. Wife additionally asked for an award of her attorney's fees "incurred as a result of [husband's] refusal to sign" the property settlement agreement.

Shortly thereafter, husband filed an objection to wife's motion and a motion seeking a declaratory judgment that the purported settlement was not a binding and enforceable settlement agreement. Citing the need for his testimony at the hearing on husband's motion, husband's attorney filed a motion to withdraw as counsel. Husband's new counsel was subsequently substituted for his original counsel.

The trial court conducted a hearing on wife's and husband's motions on March 24, 2004. At that hearing, wife called husband's former counsel as a witness to testify as to the existence of a settlement agreement between the parties. When asked by wife's counsel if, prior to the October 21, 2003 hearing, "there was a settlement of all property issues, with the exception of

- 5 -

the pension," husband's former counsel responded, "You and I reached terms for settlement of the issues that were pending before the Court, between us." Husband's former counsel further testified, on cross-examination, that "there was never an occasion during [the October 21, 2003] hearing when we specifically spread the terms on the record . . . and asked . . . each of the parties . . . to stand and affirm that it was their agreement." Husband's former counsel, who was qualified as an expert in the practice of domestic relations law in Virginia, further testified on cross-examination as follows:

> Q. [O]n how many occasions would you have been in court or before a court reporter, where there was a record, where you or your opposing attorney would recite the terms of the settlement agreement, . . . where you recited the terms or your colleague has recited the terms and had the parties affirm, make an affirmative statement that they agreed to those terms?
>
> A. Too many to count. . . . I've been doing this for 30 years. I can't imagine how many times I've done that.
>
> Q. And would it be fair to say that on those occasions when you would put those terms on the record, that it was done with much more specificity than the terms of this alleged agreement were put on the record?
>
> A. Well, . . . the idea was to attempt to make sure that no term was omitted when you are creating a record like that. And what usually happens is between the two lawyers sort of jumping in to remind another lawyer that he or she has forgotten something, the idea is to spread all of the details of the settlement on the record, before the parties are asked to affirm that it was their settlement.
>
> Q. Was that done in the record in this case?
>
> A. No.
>
> Q. Now, on those innumerable occasions when you were present where the terms were dictated onto a record, and then the parties were asked to affirm, was it the intent that the parties knew that they were affirming what had just been read as the terms of the agreement?

A. That was the idea. Obviously, they had an opportunity to say if there was some part of the record that was being created that they did not think was accurate or that something had been left out.

Q. And on those occasions, the parties would be asked words to the effect, have you heard the terms that have just been recited, and do those terms fairly and accurately represent the settlement which you believe you have settled the case on?

A. Or some similar formulation, yes.

Q. Was that ever done in open court on a record in this case?

A. No.

Husband then testified that he never signed the property settlement agreement that was presented to his counsel in this case and that, while he "affirm[ed] assets" and testified regarding "the value of the settlement" at the October 21, 2003 hearing, he did not affirm the terms of the purported settlement agreement. He further testified that he did not believe he could enter into a valid and binding property settlement agreement without formally signing a written agreement.

Noting that "legally an attorney is treated synonymously with his or her client and . . . that the parties are bound by [their attorney's] proffers and stipulations, especially when no exceptions or objections [are] noted during the hearing," the trial court ruled that the parties had reached a valid and binding property settlement agreement resolving all property division issues except husband's pension. A court reporter was present at the October 21, 2003 hearing, the court noted further, and the parties "were placed under oath and [husband] never indicated his disagreement with his own attorney or . . . wife's attorney." Accordingly, the trial court granted wife's motion for entry of a final decree of divorce incorporating the terms of the parties' property settlement agreement and awarded wife $15,000 in attorney's fees incurred with respect to the March 24, 2004 hearing.

- 7 -

Wife's counsel subsequently submitted to the trial court for entry a final decree of divorce setting forth the terms of the parties' property settlement agreement and the court's rulings on the division of husband's pension, spousal support, and attorney's fees. Filing a motion to reconsider, husband moved to have those portions of the proposed final decree guaranteeing wife a certain level of income from his pension stricken. The trial court denied husband's motion and entered the submitted final decree on April 28, 2004.

This appeal followed.

## II. ANALYSIS

"When the parties have entered into a *valid* agreement, the trial court may incorporate [the terms of] that agreement . . . into its final decree of divorce." Pelfrey v. Pelfrey, 25 Va. App. 239, 244, 487 S.E.2d 281, 283-84 (1997) (emphasis added) (citing Code § 20-109.1). The dispositive issue in this appeal is whether the parties' purported settlement agreement, the terms of which the trial court incorporated into the final decree of divorce, was a valid and binding marital agreement under Code § 20-155. Because this is a question of law involving the construction and application of Code § 20-155, we review the trial court's judgment *de novo*. See Sink v. Commonwealth, 28 Va. App. 655, 658, 507 S.E.2d 670, 671 (1998) (noting that, "[a]lthough the trial court's findings of historical fact are binding on appeal unless plainly wrong, we review the trial court's statutory interpretations and legal conclusions *de novo*").

Husband argues the alleged settlement agreement was invalid under Code §§ 20-155 and 20-149 because it was not in writing or signed by the parties and the parties' exhibits and statements regarding those exhibits at the October 21, 2003 hearing failed to comport with the specific requirements necessary to invoke the exception set forth in Code § 20-155(ii). Wife argues that not only did the exhibits and testimony of the parties satisfy the requirements of Code § 20-155(ii), the stipulation and proffers of the parties' attorneys legally bound both parties to the

terms of the agreement under <u>Newman v. Newman</u>, 42 Va. App. 557, 593 S.E.2d 533 (2004) (en banc). Because the plain meaning of the language of Code § 20-155 supports his position, we agree with husband.

"The General Assembly has identified agreements between spouses involving rights and obligations arising from the marital relationship as a unique category of agreements subject to specific requirements." <u>Flanary v. Milton</u>, 263 Va. 20, 22, 556 S.E.2d 767, 768 (2002). Code § 20-155 provides as follows:

> Married persons may enter into agreements with each other for the purpose of settling the rights and obligations of either or both of them, to the same extent, with the same effect, and subject to the same conditions, as provided in §§ 20-147 through 20-154 for agreements between prospective spouses, except that such marital agreements shall become effective immediately upon their execution. If the terms of such agreement are (i) contained in a court order endorsed by counsel or the parties or (ii) recorded and transcribed by a court reporter and affirmed by the parties on the record personally, the agreement is not required to be in writing and is considered to be executed. A reconciliation of the parties after the signing of a separation or property settlement agreement shall abrogate such agreement unless otherwise expressly set forth in the agreement.

Code § 20-150 provides that parties may enter into such agreements with respect to "[t]he disposition of property upon separation [or] marital dissolution." Code § 20-149 requires that such agreements "be in writing and signed by both parties."

Here, the marital agreement at issue, which purportedly settled the parties' property rights in connection with the divorce proceedings, was not in writing or signed by the parties. As noted above, however, Code § 20-155 provides that a marital agreement that is not in writing and not signed by the parties is valid and binding if "the terms of such agreement are (i) contained in a court order endorsed by counsel or the parties or (ii) recorded and transcribed by a court reporter and affirmed by the parties on the record personally." It is undisputed that no such mutually

"endorsed" court order was presented in this case. The question remains, however, whether the subject agreement was valid under the exception set forth in Code § 20-155(ii).

According to husband, that exception does not apply in this case because the terms of the subject agreement were not "recorded and transcribed" or "affirmed by the parties on the record personally," as required by the statute. Wife counters that, although the actual terms of the settlement agreement were not specifically recited into the record and affirmed all together at the equitable distribution hearing, the requirements of Code § 20-155(ii) were met because the parties placed the necessary terms of the agreement on the record through their exhibits and personally affirmed those terms through their sworn testimony concerning the exhibits.

We are mindful, in construing and applying Code § 20-155 in this case, that "'[c]ourts are not permitted to rewrite statutes. This is a legislative function. The manifest intention of the legislature, clearly disclosed by its language, must be applied. There can be no departure from the words used where the intention is clear.'" Barr v. Town & Country Properties, 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) (quoting Anderson v. Commonwealth, 182 Va. 560, 566, 29 S.E.2d 838, 841 (1944)). In other words, "'[w]here the legislature has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed.'" Id. (quoting Watkins v. Hall, 161 Va. 924, 930, 172 S.E. 445, 447 (1934)). "We must . . . assume that the legislature chose, with care, the words it used when it enacted the . . . statute, and we are bound by those words as we interpret the statute." Id. Accordingly, if the statutory language at issue is plain and unambiguous, we

> "give that language a 'literal construction' unless doing so 'would involve a manifest absurdity.'" [Cent. Va. Obstetrics & Gynecology Assocs., P.C. v. Whitfield, 42 Va. App. 264, 276, 590 S.E.2d 631, 638 (2004)] (quoting Chase v. DaimlerChrysler Corp., 266 Va. 544, 547, 587 S.E.2d 521, 522 (2003)). And, by literal, we mean the statutory words "should be given their 'common,

- 10 -

> ordinary and accepted'" understanding.  <u>Mouberry v. Commonwealth</u>, 39 Va. App. 576, 583, 575 S.E.2d 567, 570 (2003) (quoting <u>Germek v. Germek</u>, 34 Va. App. 1, 8, 537 S.E.2d 596, 600 (2000)).

<u>Meador v. Va. Birth-Related Neurological Injury Comp. Program</u>, 44 Va. App. 149, 154, 604 S.E.2d 88, 91 (2004).  Furthermore, we will consider the words at issue in light of the context in which they are used, which includes the other language in the statute.   <u>Murphy v. Norfolk Cmty. Servs. Bd.</u>, 260 Va. 334, 339-40, 533 S.E.2d 922, 925 (2000).

As relevant to the issue before us, the language used in Code § 20-155(ii) is plain and unambiguous and, construed literally, clearly manifests the legislature's intent to provide a specific method by which an unwritten, unsigned marital agreement may be exempted from the requirements of Code § 20-149.  Pursuant to Code § 20-155(ii), the requirements that a marital agreement be in writing and signed by the parties do not apply if the terms of the agreement are "*recorded and transcribed* by a court reporter and *affirmed* by the parties on the record personally."  (Emphasis added.)  In light of the context in which it is used in the statute, the verb "record" commonly means "to put into written form" or "cause (sound . . .) to be transferred to and registered on something (as a . . . magnetic tape) by mechanical usu[ally] electronic means in such a way that the thing so transferred and registered can (as by the use of a . . . tape recorder) be subsequently reproduced."  <u>Webster's Third New International Dictionary</u> 1898 (1993). "Transcribe" means to "to make a written or typed copy of (spoken material, esp[ecially] testimony)."  <u>Black's Law Dictionary</u> 1535 (8th ed. 2004).  It logically follows that, as used in Code § 20-155(ii), the term "court reporter" refers to a "person who records testimony, stenographically or by electronic or other means, and, when requested, prepares a transcript."  <u>Id.</u> at 391.  Moreover, as used in the statute, the term "affirm" is an exact synonym of "confirm," which commonly means "to make valid by formal assent."  <u>Webster's</u>, <u>supra</u>, at 35, 476.

- 11 -

Applying these definitions, it is clear that, contrary to wife's claim, the placement of a written exhibit directly into the record is not the same thing as having the contents of that exhibit "recorded and transcribed by a court reporter." A written exhibit obviously is not spoken material and, thus, by definition, is not something that can generally be transcribed by a court reporter. Indeed, a court reporter cannot logically put a written exhibit into written form or cause the sound of a written exhibit to be registered on something by mechanical means unless the exhibit is read into the record. Thus, where a marital agreement subject to the requirements of Code § 20-149 is not in writing or signed by the parties, the mere introduction into evidence, as in this case, of written exhibits reflecting various terms of the agreement is not enough to satisfy Code § 20-155(ii)'s mandate that the terms of the agreement be "recorded and transcribed by a court reporter." See generally De Avies v. De Avies, 42 Va. App. 342, 344, 592 S.E.2d 351, 352 (2004) (noting that, after submitting several written exhibits reflecting the agreed disposition of the parties' assets, counsel, "[o]n behalf of their respective clients, . . . read into the record in open court [with a court reporter present] the specific terms of their agreement on all issues").

It is equally clear from the plain meaning of the language of Code § 20-155(ii) that the giving of testimony by the parties that merely reflects the existence of the marital agreement at issue and describes some of the terms of that agreement, as occurred in this case, is not the equivalent of affirming the actual terms of the agreement themselves. Likewise, the failure of a party to personally voice an objection during the proceedings to statements by either party's counsel reflecting the existence of such an agreement does not constitute the giving of a "formal assent" on the record to the terms of the agreement. In light of the requisite solemn and ceremonial nature of such an assent, Code § 20-155(ii) plainly contemplates that the parties perform some affirmative act that officially manifests their assent to the terms of the agreement

- 12 -

on the record.  See Webster's, supra, at 893 (defining "formal" as, *inter alia*, "ceremonial" and "carried out with solemnity").

We conclude, therefore, that, to satisfy Code § 20-155(ii)'s mandate that the terms of the agreement be "recorded and transcribed by a court reporter and affirmed by the parties on the record personally," the terms of the agreement must be read or recited into the record in the presence of a court reporter and the parties must specifically and affirmatively manifest their assent to those terms on the record.  Not only does this literal application of the language used in Code § 20-155(ii) not lead to absurd results, to hold otherwise would be to impermissibly expand the scope of the exception set forth in Code § 20-155(ii) in a manner that is inconsistent with the statute's plain terms.  See Commonwealth v. Brown, 259 Va. 697, 704-05, 529 S.E.2d 96, 100 (2000) (holding that, under the fundamental principle of statutory construction *expressio unius est exclusio alterius*—which "provides that where a statute speaks in specific terms, an implication arises that omitted terms were not intended to be included within the scope of the statute"—when a "'legislative enactment limits the manner in which something may be done, the enactment also evinces the intent that it shall not be done another way'" (quoting Grigg v. Commonwealth, 224 Va. 356, 364, 297 S.E.2d 799, 803 (1982))); cf. Flanary, 263 Va. at 23, 556 S.E.2d at 769 (holding that a court may not read a new exception into a "statute plain on its face").  Had the legislature wished to create a more expansive exception, it could have done so, but it did not.

We further conclude that wife's reliance on Newman is misplaced.  In Newman, we held "that an attorney acting with actual authority may sign a consent decree on his client's behalf and thereby satisfy the signature requirement of Code § 20-109(C)" and upheld the trial court's denial of the former husband's motion to modify his contractual obligation to pay his former wife spousal support pursuant to an agreed support award executed solely by the parties'

respective counsel. 42 Va. App. at 568, 593 S.E.2d at 539. In reaching that decision, we concluded that Code 20-109(C) did not displace the common law of agency, under which "the signature of a disclosed, authorized agent has the same legal force as the signature of his principal." Id. at 567, 593 S.E.2d at 538 ("Absent a clearly expressed legislative intent otherwise, statutes should not be construed to displace long-established common law principles.").

The present case, however, is not an agency case. Code § 20-155(ii), unlike Code § 20-109(C), clearly displaces the common law principles of agency. Code § 20-155(i) specifically permits the parties' "counsel or the parties" to endorse the order containing the terms of the marital agreement at issue. Conversely, Code § 20-155(ii) requires that the terms of the agreement at issue be "affirmed by the parties on the record personally." In light of the context in which it is used in the statute, the term "personally" means "so as to be [done in person without the intervention of another]." Webster's, supra, at 1686-87. Plainly, in specifically requiring in Code § 20-155(ii) that the parties affirm the terms of the marital agreement at issue "personally," the legislature intended that the parties' counsel not be permitted to affirm the terms of the agreement for the parties. Thus, the fact that the parties' respective counsel stipulated in this case to the existence of an agreement in their representations to the trial court and set forth the terms of the parties' property settlement agreement in e-mails to each other and the fact that husband's former counsel testified he had authority to enter into an agreement for husband and reached such an agreement with wife's counsel are inapposite to the issue before us in this case.

We conclude, therefore, that, because the terms of the marital agreement at issue in this case were not "recorded and transcribed by a court reporter and affirmed by the parties on the record personally," the exception set forth in Code § 20-155(ii) does not apply and the agreement

- 14 -

at issue is not a valid agreement under Code §§ 20-155 and 20-149. Consequently, the trial court erred in incorporating the terms of that agreement into the final decree of divorce.

Accordingly, we reverse the decision of the trial court and remand the issue of equitable distribution for further proceedings consistent with this opinion. Furthermore, because it is part of the overall equitable distribution award and will necessarily be impacted by those further proceedings, we also reverse and remand the issue of the division of husband's pension for consideration anew under Code § 20-107.3. Similarly, because the court's award of $15,000 in attorney's fees to wife was based on the trial court's determination that the parties had entered into a valid and binding property settlement agreement, we reverse and remand the issue of attorney's fees for consideration anew in light of our decision that the parties did not enter into a valid and binding property settlement agreement. In view of our reversal and remand of the disposition of husband's pension and the award of attorney's fees, we do not reach the merits of husband's claims of error regarding those matters here.

Reversed and remanded.