COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Elder and Beales
Argued at Alexandria, Virginia


CHESTER E. MILLER

   v.   Record No. 2223-06-4
                                               MEMORANDUM OPINION[*] BY
LINDA S. MILLER                                JUDGE RANDOLPH A. BEALES
                                               SEPTEMBER 11, 2007
LINDA S. MILLER

v.        Record No. 2354-06-4

CHESTER E. MILLER


             FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                          LeRoy F. Millette, Jr., Judge

             Catherine S. Croft (Farrell & Croft, P.C., on briefs), for Chester E.
             Miller.

             Elizabeth Munro von Keller (Arthur Von Keller IV, on briefs), for
             Linda S. Miller.


        Chester E. Miller (husband) appeals from a final decree of divorce from Linda S. Miller

(wife) entered by the Prince William County Circuit Court on August 16, 2006, and from the

accompanying Court Order Acceptable for Processing (COAP) that the trial court entered on the

same day as the final decree.  Wife also appeals from the final decree.  We have consolidated their

appeals and address their contentions here.

        Husband argues that the trial court erred in finding the antenuptial agreement between the

parties was ambiguous and accepting parol evidence on the intentions of the parties.  He argues this

error was compounded when the court interpreted the antenuptial agreement as allowing distribution

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

of his pension and allowing an award of spousal support to wife. He also claims the trial court erred

when it included language in the COAP allowing wife to transfer her interest in the pension to an

alternate payee should she predecease husband. In her appeal, wife argues that the trial court erred

in finding the antenuptial agreement remained valid, even though the court also found the parties

mutually intended to revoke the agreement. Wife claims she relied to her detriment on the

revocation of the agreement. For the reasons noted herein, we affirm the trial court's rulings.

## I. Background

Prior to their marriage in 1987, the parties signed an antenuptial agreement in wife's

home country of Canada, but stipulated that the laws of the Commonwealth of Virginia would

govern their contract. Several months after the birth of their first child in 1988, the parties

agreed that they no longer needed the antenuptial agreement and threw the only known copy of it

into a fire. After the parties separated in 2004, wife discovered that her mother had another copy

of the antenuptial agreement. The parties agree that this newly discovered document is an exact

copy of the original agreement.

Paragraph 1 of the antenuptial agreement sets the term of the contract at "199 years from

the date hereof or until the parties herein shall mutually agree to its termination." Paragraph 2 of

the agreement states:

> Each party shall during his or her lifetime keep and retain sole
> ownership, control and enjoyment of all property, real and personal
> now owned or hereafter acquired by him or her, free and clear of
> any claim by the other. Complete lists of [husband's] and [wife's]
> personal property are attached as Exhibits A and B respectively.[1]

---

[1] The exhibits list several items of personal property, specific retirement accounts, and proceeds from the sales of their separate homes. The parties agree that these listed values constitute separate property and do not argue on appeal that the trial court erred in distributing these amounts.

In paragraph 9, the agreement states:

> In the event of dissolution of the contemplated marriage between [wife] and [husband], these sums ([wife $10,032.00 Canadian and [husband] $48,876.00 American) shall be returned free and clear in whole or proportionately prior to any equitable distribution of marital property, after calculating the amounts in a common currency at the rate of exchange at the time of calculation.

Paragraph 10 provides, "This agreement contains the entire understanding of the parties. There are no representations, warranties, promises, covenants or undertakings, oral or otherwise, other than those expressly set forth herein." The agreement does not contain a section of definitions and does not define marital property or separate property. The agreement does not mention spousal support or alimony.

The trial court found that, although the parties mutually intended to revoke the antenuptial agreement when they threw it into the fire, the agreement was still binding because the revocation was not in writing as required by Code § 20-153. The Court then found the antenuptial agreement was ambiguous and accepted parol evidence.

Wife testified that the pensions existing at the time of the marriage were separate property under the agreement, but she did not intend to waive any rights to future accruals of pensions when she signed the agreement. She also testified that the agreement was not intended to prevent her from developing an interest in property acquired during the marriage, and she did not think her husband interpreted the agreement that way until divorce proceedings started. The agreement, according to wife's testimony, was intended only to protect the parties' interests in the property that they owned prior to the marriage and did not address any other issues.

During initial questioning by his counsel, husband essentially agreed that the antenuptial agreement covered only property existing when the parties were wed. Husband later said he thought all the property that he bought during the marriage would be his separate property. The trial court found the agreement was not intended to cover property acquired during the marriage,

but instead was designed to protect the assets that the parties owned before the marriage. The trial court also found the agreement did not address spousal support.

As part of the equitable distribution award, the trial court awarded a portion of husband's Federal Employees Retirement System (FERS) pension, acquired after the marriage, to wife. The COAP entered for submission to the federal government included a provision that allowed wife, in the event of her death, to award her share of the pension to the parties' children.

Husband was ordered to pay $1,300 per month in spousal support to wife for four years, then $500 per month for an additional four and a half years.

## II. Analysis

### A. Enforcement of the Antenuptial Agreement

Wife argues that the parties effectively revoked the antenuptial agreement. Alternatively, she argues that equitable estoppel prevented husband from asking the trial court to enforce the agreement. Husband argues that they did not revoke the agreement and estoppel does not apply.

At the time that the parties signed the antenuptial agreement (and still today) Code § 20-153 stated: "After marriage, a premarital agreement may be amended or revoked only by a written agreement signed by the parties." Wife acknowledges that the parties did not revoke the agreement in writing. However, she contends Code § 20-150(8) permits parties to contract regarding "[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty." She argues that the parties included in their agreement a provision allowing the parties to "mutually agree to its termination" and, thereby, they contracted to permit revocation of the antenuptial agreement without another written agreement. Alternatively, wife argues that she relied to her detriment on the representation of husband that the agreement was revoked, so husband should be estopped from arguing for enforcement of the antenuptial agreement.

- 4 -

The issues presented here involve questions of both law and fact. We defer to the trial court's decisions on questions of fact, such as whether the parties intended to revoke the agreement, but review *de novo* questions of law, such as the interpretation of the code sections governing antenuptial agreements. See Gaffney v. Gaffney, 45 Va. App. 655, 665, 613 S.E.2d 471, 476 (2005).

## 1. Revocation of an Antenuptial Agreement

Code § 20-153 clearly and specifically states that "[a]fter marriage, a premarital agreement may be amended or revoked *only* by a written agreement signed by the parties." (Emphasis added.) As Virginia law governs the antenuptial agreement here, this statute's mandates are part of that contract. See Harbor Gate Owners' Ass'n v. Berg, 232 Va. 98, 106, 348 S.E.2d 252, 257 (1986) ("Where a written contract is silent on a matter controlled by statute, the statutory requirement becomes an unwritten term of the contract implied in law."). As the parties did not execute a signed, written document revoking the 1987 agreement, that original agreement remained in effect.

Wife acknowledges that Code § 20-153 generally applies to all antenuptial agreements. However, she argues that, as permitted by Code § 20-150(8), the parties included in Paragraph 1 of the antenuptial agreement an enforceable provision that allowed the parties to "mutually agree to its termination" without a writing. We disagree.

Code § 20-150 lists the matters that parties may address in antenuptial agreements. Subsection 8 allows such agreements to address "[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty." We find that this subsection does not permit parties to include provisions in abrogation of requirements of Code § 20-153.

First, Code § 20-153 specifically states that premarital agreements can *only* be revoked in writing. This statute includes no exceptions. We "must accept its plain meaning." Perez v. Capital One Bank, 258 Va. 612, 616, 522 S.E.2d 874, 876 (1999). Given this specific wording, in contrast to the general wording of Code § 20-150(8), we find the specific wording of Code § 20-153 must control and parties may not deviate from its restrictions.

Second, Paragraph 1 of the parties' agreement did not specifically authorize a method of revocation other than in writing. It simply says that they can mutually agree to revoke the agreement. Paragraph 1 addresses *when* the parties can revoke the agreement, but it does not address *how* the parties can effect and memorialize their revocation other than as required by Code § 20-153. Cf. Hardesty v. Hardesty, 40 Va. App. 663, 581 S.E.2d 213 (2003) (en banc) (finding an agreement must specifically and clearly state the intention of the parties to abrogate the specific dictates of the Code regarding termination of spousal support).

The trial court found "the parties clearly . . . had an intent to revoke [the agreement], but they did not effectively do that." The trial court did not err in reaching this conclusion.

## 2. Estoppel

Wife argues that, if the agreement was not effectively revoked, equitable estoppel should preclude husband from arguing for enforcement of the agreement.[2]

The principle of equitable estoppel applies to antenuptial agreements. Code § 20-152 ("[The] equitable defenses limiting the time for enforcement, including laches and estoppel, are available to either party."). "[T]he party who relies upon estoppel must prove each element by clear, precise, and unequivocal evidence. Because the doctrine of estoppel prevents the showing

---

[2] The trial court made no explicit findings on this issue, as wife admits in her reply brief. However, wife made this argument to the trial court, and the court then found the agreement was enforceable. We therefore presume that the trial court found equitable estoppel did not prevent enforcement of the agreement.

of the truth, it is applied rarely and only from necessity." <u>Princess Anne Hills v. Susan Constant Real Estate</u>, 243 Va. 53, 59, 413 S.E.2d 599, 603 (1992) (citations omitted).

"Elements necessary to establish equitable estoppel, absent a showing of fraud and deception, are a representation, reliance, a change of position, and detriment." <u>T. v. T.</u>, 216 Va. 867, 872-73, 224 S.E.2d 148, 152 (1976); <u>see</u> <u>Webb v. Webb</u>, 16 Va. App. 486, 494-95, 431 S.E.2d 55, 61 (1993) (noting that the elements of estoppel are a representation, reliance, change of position, and detriment). The parties agree that these elements control here, but disagree on whether the evidence was sufficient to establish these elements. As this is an evidentiary question, this Court reviews the record in the light most favorable to husband, who prevailed on this issue before the trial court. <u>See</u> <u>id.</u> at 491, 431 S.E.2d at 59; <u>Higginbotham v. Commonwealth</u>, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

The parties believed they had destroyed the only copy of their antenuptial agreement and thereby revoked it. Wife and husband *both* made this representation, either mutually or at wife's instigation. Husband did not induce wife with his representations – in fact, she suggested that they throw the document into the fire. The evidence more strongly suggests *she* represented to *him* that the agreement was revoked. We see little evidence of a representation by husband to wife.

In addition to representation, a party who argues for estoppel must prove that she made a change or stopped acting based on the representation. <u>See</u> <u>Emrich v. Emrich</u>, 9 Va. App. 288, 293-94, 387 S.E.2d 274, 276-77 (1989) (finding the trial court erred when it refused to allow wife to file a late answer to husband's petition for divorce, as husband had represented to wife that she did not need to answer the petition because they were reconciled, he had moved in with her, and he told her that he was withdrawing the petition). Nothing in this record suggests wife took any action or stopped any action in reliance on her belief that the contract no longer existed.

Wife argues on appeal that she would not have agreed to refinance the home if she had known that the agreement was still valid. However, she did not testify to that fact. Wife did testify that she would not have married husband and moved to Virginia if the antenuptial agreement had meant she "would acquire absolutely no interest in any asset." She testified that the home was refinanced "six or seven" times, and she said the funds generated by these refinancings were used to pay off debt. However, she did not testify that she agreed to refinance the home because the parties threw the agreement into the fire. No other evidence was presented that she agreed to refinance the house because she thought the antenuptial agreement was revoked.[3] On appeal, wife does not reference any place in the trial record where she presented evidence to prove reliance.

We find the evidence was insufficient to support wife's claim that husband was estopped from enforcing the antenuptial agreement. The trial court did not err in failing to apply equitable estoppel here.

### B. Interpretation of the Antenuptial Agreement[4]

The standard for review of antenuptial agreements is well established:

> "Antenuptial agreements, like marital property settlements, are
> contracts subject to the rules of construction applicable to contracts

---

[3] Wife's attorney did argue to the trial court that wife only agreed to the refinancings because she believed the agreement was revoked, but counsel's argument does not constitute evidence. See Cook v. Hayden, 183 Va. 203, 226, 31 S.E.2d 625, 634 (1944) (noting that a trial court properly did not consider counsel's representations as evidence); McCoy v. Commonwealth, 125 Va. 771, 778, 99 S.E. 644, 646 (1919) (finding that counsel's argument to a jury was "unsupported by any evidence" and, therefore, improper). On appeal, wife's attorney argued that wife would have returned to the workforce, and suggests that she would not have had a second child, if she believed that the antenuptial agreement was still in effect. Again, wife did not provide any testimony regarding how her belief that the agreement was revoked changed her behavior, and an attorney's representations on appeal do not provide an adequate substitute for evidence presented to a trial court.

[4] Neither party argues that the agreement is ambiguous regarding pre-marital property, and the issues on appeal do not relate to division of those assets.

generally, including the application of the plain meaning of unambiguous contractual terms." Pysell v. Keck, 263 Va. 457, 460, 559 S.E.2d 677, 678 (2002). "When a written marital agreement is presented, a court applies the same rules of formation, validity and interpretation used in contract law, except where specified by the Code." Shenk v. Shenk, 39 Va. App. 161, 170, 571 S.E.2d 896, 901 (2002) (internal citations and quotations omitted).

King v. King, 40 Va. App. 200, 206, 578 S.E.2d 806, 809 (2003). On appeal, we review *de novo* a trial court's rulings on the ambiguity of a contract, but, if reached, we defer to the factual findings of the trial court regarding the intentions of the parties. Vilseck v. Vilseck, 45 Va. App. 581, 588 n.3, 612 S.E.2d 746, 749 n.3 (2005) ("Absent the necessity to consider extrinsic evidence, 'appellate courts review trial court interpretations of contractual texts *de novo* because we have an equal opportunity to consider the words within the four corners of the disputed provision.' Smith [v. Smith], 43 Va. App. [279,] 288 n.2, 597 S.E.2d [250,] 255 n.2 [(2004)] (citations and internal quotation marks omitted)."). After reviewing the text of the agreement, we find the trial court did not err in finding that the contract was ambiguous nor in concluding that the contract did not address the division of property acquired during the marriage.

"We adhere to the 'plain meaning' rule in Virginia: 'Where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.'" Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983) (quoting Globe Iron Constr. Co. v. First Nat'l Bank of Boston, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965)). "A contract term is not ambiguous merely because the parties disagree as to the term's meaning." Bergman v. Bergman, 25 Va. App. 204, 211, 487 S.E.2d 264, 267 (1997).

> However, when a contract is ambiguous, the Court will look to parol evidence in order to determine the intent of the parties. Aetna Cas. and Sur. Co. v. Fireguard Corp., 249 Va. 209, 215, 455 S.E.2d 229, 232 (1995). Contract language is ambiguous when "it may be understood in more than one way or when it refers to two

or more things at the same time."  Granite State Ins. Co. v.
Bottoms, 243 Va. 228, 234, 415 S.E.2d 131, 134 (1992).

Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 632, 561 S.E.2d 663, 667 (2002).

Paragraph 2 of the antenuptial agreement states:

> Each party shall during his or her lifetime keep and retain sole
> ownership, control and enjoyment of all property, real and personal
> now owned or hereafter acquired by him or her, free and clear of
> any claim by the other.  Complete lists of [husband's] and [wife's]
> personal property are attached as Exhibits A and B respectively.

Paragraph 9 of the antenuptial agreement provides that, in the event of a divorce,

> these sums ([wife] $10,032.00 Canadian and [husband] $48,876.00
> American) shall be returned free and clear in whole or
> proportionately prior to any equitable distribution of marital
> property, after calculating the amounts in a common currency at
> the rate of exchange at the time of calculation.

The amounts in Paragraph 9 correspond to amounts listed in Exhibits A and B.  No paragraph in the agreement defines separate property or marital property, nor does any paragraph designate income as separate, as opposed to marital, property.  Paragraph 10 states, "This agreement contains the entire understanding of the parties.  There are no representations, warranties, promises, covenants or undertakings, oral or otherwise, other than those expressly set forth herein."  The agreement does not mention spousal support or alimony.

Husband argues that Paragraph 2 clearly states that any property acquired during the marriage shall be treated as separate property unless titled in the name of both parties.  Therefore, he claims, the only property subject to equitable distribution is the marital home, which is jointly titled.  He also argues, as the antenuptial agreement defines income as separate property and does not specifically mention spousal support, the agreement clearly precludes an award of spousal support.  We disagree with husband's interpretation of the antenuptial agreement.

- 10 -

1.  Property Division

Paragraph 2 says that the parties "*keep and retain* sole ownership" of property that either one of them owned when the agreement was signed and of property acquired "hereafter." (Emphasis added.) Husband argues this paragraph means that any property that either party acquired during the marriage is presumedly separate property, not subject to equitable distribution. We disagree.

As the agreement does not define its terms, we must turn to the generally accepted definitions in Virginia, the law governing this contract. Virginia law starts with the well-settled presumption that property acquired during a marriage is acquired by *both* parties and is marital property. Smith, 43 Va. App. at 286-87, 597 S.E.2d at 254; Rahbaran v. Rahbaran, 26 Va. App. 195, 209, 494 S.E.2d 135, 141 (1997); see Code § 20-107.3(A). Therefore, generally, property acquired during the marriage is not the "sole" property of one spouse, so neither spouse can "keep or retain sole ownership," even if all purchases are financed with the salary of one spouse. As this Court explained in Robinson v. Robinson, 46 Va. App. 652, 670 n.17, 621 S.E.2d 147, 156 n.17 (2005) (en banc):

> In most cases, the money earned by the parties during the marriage constitutes marital property, and the assets purchased with that income are also marital property. See Code § 20-107.3(A)(2) (defining "marital property" as, *inter alia*, all property "acquired by each party during the marriage which is not separate property"). Regardless of whether the wife worked outside the home, she would therefore be entitled to a share of those assets. See Code § 20-107.3(E).

However, spouses can acquire separate or "sole" property after marriage, for example, through inheritance or a gift from a third party. See Code § 20-107.3(A)(1); Robinson, 46 Va. App. at

663, 621 S.E.2d at 153 (noting that the income from husband's trust, which he inherited from his mother, was separate property).[5]

The antenuptial agreement does not change these basic definitions, although husband argues otherwise. In Vilseck, 45 Va. App. 581, 612 S.E.2d 746, Mr. Vilseck also argued that his antenuptial agreement defined all property as separate property, and, therefore, none of the property was subject to equitable distribution. The agreement in Vilseck defined "separate property" as "all real and personal property of each of the parties and all rights and interests in such property of whatever kind and wherever located, regardless of whether such property is now owned or hereafter acquired." Id. at 585, 612 S.E.2d at 748. Contrast King v. King, 40 Va. App. 200, 578 S.E.2d 806 (2003) (noting the agreement specifically defined "separate" and specifically defined future income as separate property). This Court explained in Vilseck:

> In this case, we find the plain meaning of the agreement is not nearly as plain as either party asserts. To begin with, the definition of "Separate Property" in paragraph 2(B) does not say (as Vilseck translates it to say) that all property separately acquired and titled during marriage must necessarily be placed outside the reach of the equitable distribution statute. The actual text says considerably less than that. To be sure, the ostensible definition involves somewhat of a tautology, for it states "the term 'Separate Property' shall mean all real and personal property of each of the parties" -- which is little more than saying separate property is property of each separate party.
>
> True enough, the "property of each" tautology needs no explanation for property owned separately prior to the marriage. Her car is hers, his boat is his, and so on. After marriage, however, it is not so easy to distinguish between the two. But that is exactly what the remainder of the sentence requires, for it adds the possibility that, whatever contractual "Separate Property" may be, it can be property either "now owned or hereafter acquired."

---

[5] Husband argues that Code § 20-148, because it includes "income" in the definition of "property," requires that courts interpret the term "property" in antenuptial agreements as synonymous with "separate property." However, Code § 20-148 does not define *separate* property, but instead defines only the term "property" generally. Under Virginia law, "property" can refer to either marital or separate property. Code § 20-107.3. Therefore, Code § 20-148 does not control the determination of whether income is separate or marital.

> On brief, Vilseck fills in this ambiguity with the caveat that contractual "Separate Property" acquired during marriage applies only to property separately acquired and titled. At oral argument, Vilseck added that fungible salary income from his medical practice, though not subject to a document of title, would be "Separate Property" as soon as he placed it in his separate checking account. That assertion, which we need not dwell on, merely begs the question. Suffice it to say, nothing in the contractual text states that separately titled property has a contractual immunity from equitable distribution.

Vilseck, 45 Va. App. at 589-90, 612 S.E.2d at 750.

As in Vilseck, the agreement here does not adequately define which property is excluded from equitable distribution. Husband argues that the agreement clearly gives him all the property he bought during the marriage, but the document does not contain a definition supporting this interpretation of the contract. The agreement does not contain a provision defining "sole" or separate property as any property that is not jointly titled. Therefore, husband's interpretation of the contract's language is not grounded in the four corners of the agreement.

The only clear provisions in this document relate to the property listed in Appendix A and Appendix B. As the parties were expecting to commingle their separate funds to purchase the marital home, which could have converted those separate assets into marital property, the agreement protected the parties' rights to those separate assets. See Code § 20-107.3(A)(3). Regarding property acquired after the marriage, the agreement is not clear. The trial court did not err in finding the agreement inconsistent and needing interpretation. Therefore, the parol evidence was properly admitted and considered.

Wife testified the agreement was "just to protect what he was bringing in and what I was bringing in." She also testified that she did not believe the agreement waived any interest in pensions or retirement accounts that husband might earn through his future employment. Husband's testimony initially suggested he also thought that the agreement covered only

- 13 -

pre-marital property, plus any separate property acquired after marriage, e.g., through inheritance or gift. The trial court found husband's later testimony, which contradicted his initial testimony, was not credible and concluded that the agreement addressed only the assets existing prior to the marriage. We must defer to these findings. See Strickland v. Barnes, 209 Va. 438, 445, 164 S.E.2d 768, 773 (1968) ("'Where . . . the meaning of a writing is uncertain or ambiguous and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the . . . [trier of fact]'." (quoting Portsmouth Gas Co. v. Shebar, 209 Va. 250, 258, 163 S.E.2d 205, 211 (1968))).

The trial court did not err in accepting parol evidence nor in determining that the antenuptial agreement addressed only the division of pre-marital assets.

## 2. Spousal Support

Husband also argues that, as the agreement does not mention spousal support, the agreement clearly precludes an award of support to wife. He contends that Paragraph 2 and the preamble support this interpretation of the antenuptial agreement.

The preamble says that the parties

> desire to fix and determine by antenuptial agreement the rights and claims that will accrue to each of them in the estate and property of the other by reason of marriage, and to accept the provisions of this agreement in lieu of and in full discharge, settlement, and satisfaction of all such rights and claims.

The preamble does not clearly say that it addresses *all* rights and claims, but "all *such* rights and claims." The only rights or claims mentioned in the agreement are pre-existing property rights, not the entitlement to spousal support. Although preambles can assist a court in its review of a contract, preambles such as the one here are not helpful and are not binding. See Vilseck, 45 Va. App. at 589 n.4, 612 S.E.2d at 749 n.4. The agreement does not address all of the possible rights of spouses under Virginia law, only issues related to pre-marital property.

- 14 -

At best, the agreement is silent regarding spousal support. The issue is not addressed within the four corners of the document. Paragraph 10 explicitly states that "[t]here are no representations, warranties, promises, covenants, or undertakings" other than the express provisions in the agreement. Therefore, only the explicit provisions found in the antenuptial contract are part of the agreement, and the parties do not have any other issues on which they agreed to contract. As the Supreme Court explained in Davis v. Davis, 239 Va. 657, 661, 391 S.E.2d 255, 257 (1990),[6]

> Had the parties intended their contract to apply to their
> spousal-support rights, they could have included express covenants
> to that effect. They did not, and we must construe and apply the
> contract as it was written. Accordingly, we hold that the
> antenuptial agreement did not contemplate surrender of the parties'
> respective rights to claim and to prove entitlement to spousal
> support . . . .

Given the inexact language and the failure to mention spousal support, the antenuptial agreement here is, at best, ambiguous on the issue of support. The trial court correctly accepted parol evidence on this issue.

The parol evidence, as discussed *supra*, indicated that the parties intended to address only their pre-existing property, not property acquired after the marriage or entitlements to spousal support. The trial court heard this evidence and reached the conclusion that the agreement did not address spousal support. The trial court did not abuse its discretion in reaching this

---

[6] Husband argues that Davis is not applicable here because the Davis agreement was executed in 1982, prior to the effective date of the Virginia Premarital Agreement Act. Code § 20-147 ("This chapter shall apply to any premarital agreement executed on or after July 1, 1986."). He contends that the definition of "property" in Code § 20-148, which includes "income," nullifies the analysis in Davis as it relates to agreements executed after July 1, 1986. However, this statutory definition does not define *spousal support* as property, only income. The definition is consistent with the finding in Davis that "the right to spousal support is not a property interest, and it does not accrue by operation of law but only upon proof of entitlement." 239 Va. at 661, 391 S.E.2d at 257. Virginia law still treats property interests and spousal support entitlements separately. See Code §§ 20-107.1, 20-107.3. Therefore, we find Davis is applicable here.

conclusion and, therefore, did not err in awarding spousal support.  See Strickland, 209 Va. at 445, 164 S.E.2d at 773.

## C.  The COAP

Husband argues that the trial court erred when it included in the COAP a provision allowing wife's share of the FERS pension go to the parties' children upon her death.[7]  He claims such a provision is an impermissible extension of the court's power to distribute assets as limited by Code § 20-107.3(C) and (G).

Husband does not argue that the Office of Personnel Management (OPM)[8] will reject any COAP containing this provision.  In fact, provisions that assign pension benefits to the parties' children are specifically permitted under the federal regulations.  See 5 C.F.R. 838.237(b) (a COAP is acceptable if it directs OPM "to pay, after the death of the former spouse, the former spouse's share of the employee annuity to . . . (4) One or more of the retiree's children . . .").  Husband admitted such provisions are acceptable to the federal government in a memorandum of law that he filed with the trial court.

Code § 20-107.3(C) states, in pertinent part, that "[e]xcept as provided in subsection G, the court shall have no authority to order the division or transfer of separate property or marital property which is not jointly owned."  Subsection (G) addresses pensions specifically:

> In addition to the monetary award made pursuant to subsection D, and upon consideration of the factors set forth in subsection E:
>
> 1.  The court may direct payment of a percentage of the marital share of any pension, profit-sharing or deferred compensation plan or retirement benefits, whether vested or nonvested, which

___

[7] If this provision is not included in the COAP, then the money reverts to husband on wife's death.  See 5 C.F.R. 838.237(a) ("Unless the [COAP] expressly provides otherwise, the former spouse's share of an employee annuity terminates on the last day of the month before the death of the former spouse, and the former spouse's share of employee annuity reverts to the retiree.").

[8] OPM oversees and administers FERS pension plans.  5 C.F.R. § 838.101.

constitutes marital property and whether payable in a lump sum or over a period of time. The court may order direct payment of such percentage of the marital share by direct assignment to a party from the employer trustee, plan administrator or other holder of the benefits. However, the court shall only direct that payment be made as such benefits are payable. No such payment shall exceed 50 percent of the marital share of the cash benefits actually received by the party against whom such award is made. "Marital share" means that portion of the total interest, the right to which was earned during the marriage and before the last separation of the parties, if at such time or thereafter at least one of the parties intended that the separation be permanent.

2. To the extent permitted by federal or other applicable law, the court may order a party to designate a spouse or former spouse as irrevocable beneficiary during the lifetime of the beneficiary of all or a portion of any survivor benefit or annuity plan of whatsoever nature, but not to include a life insurance policy. The court, in its discretion, shall determine as between the parties, who shall bear the costs of maintaining such plan.

The COAP says: "In the event the [wife] predeceases [husband], the [wife] shall be entitled to direct that her share of the annuity, which is her property, shall be paid to the surviving children of the marriage in equal shares and she does hereby so direct." This language does not "order the division or transfer" of anything. Instead, this language acknowledges that, as the trial court has ordered the division of the pension as allowed under Code § 20-107.3(G), wife has certain entitlements given to her under the federal regulations.

The trial court did not "order" that wife be entitled to direct the survival benefit of her portion of the pension – the order simply acknowledged this fact. The trial court also did not "order" that wife designate the children as her beneficiaries – the order simply acknowledged the fact that wife directed the OPM to so designate her portion of the pension. As this portion of the pension belongs to wife, she is entitled to do with it as she pleases, within the regulations of the pension plan. The trial court did not inappropriately exercise any judicial authority when it included this sentence in the COAP.

### III. Conclusion

The trial court did not err in finding the parties failed to effectively revoke their antenuptial agreement. Given the wording of that agreement, the trial court appropriately considered parol evidence and did not abuse its discretion in finding that the agreement dealt only with the pre-marital assets of the parties. The trial court did not err in awarding spousal support or in entering the COAP. The decision of the trial court is affirmed, and we deny each party's request for attorney's fees incurred in their appeals.

Affirmed.

Benton, J., concurring, in part, and dissenting, in part.

I dissent only from that portion of the opinion styled "The COAP." I, otherwise, concur in the opinion.

Code § 20-107.3 provides in pertinent part as follows:

> The court may direct payment of a percentage of the marital share of any pension, profit-sharing or deferred compensation plan or retirement benefits, whether vested or nonvested, which constitutes marital property and whether payable in a lump sum or over a period of time. The court may order direct payment of such percentage of the marital share by direct assignment to a party from the employer trustee, plan administrator or other holder of the benefits. However, the court shall only direct that payment be made as such benefits are payable.

Code § 20-107.3(G)(1).

By order of August 16, 2006, the trial judge ordered the Federal Employees Retirement System as follows:

> In the event the Former Spouse predeceases the Employee, the Former Spouse shall be entitled to direct that her share of the annuity, which is her property, shall be paid to the surviving children of the marriage in equal shares and she does hereby so direct.[9]

---

[9] The order also provides as follows:

> The United States Office of Personnel Management is directed to pay the Former Spouse's share, as set forth above, directly to the Former Spouse at the same time and in the same manner as payments are made to the Employee. FERS shall commence payment directly to the Former Spouse of her share of said benefits, as and when paid to the Employee, and *payments shall continue* thereafter for as long as the Employee has the right to receive said annuity or *until the death of either party*.

(Emphasis added).

I agree with the husband that this order exceeds the judge's statutory authority. The Supreme Court has "stated repeatedly that jurisdiction in divorce suits is purely statutory." Lapidus v. Lapidus, 226 Va. 575, 578, 311 S.E.2d 786, 788 (1984).